ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 15-3075

---

NIZAR TRABELSI,                                    Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,                          Defendant-Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

BRIEF FOR APPELLANT

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

MARY MANNING PETRAS
Assistant Federal Public Defender
Counsel for Defendant-Appellant
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
mary_petras@fd.org

District Court
1:06-cr-00089-RWR-1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    PARTIES AND AMICI**

This appeal arises from a criminal proceeding involving the defendant-appellant, Nizar Trabelsi, and the plaintiff-appellee, the United States of America. The parties on appeal are the same as those below. There are no intervenors or amici.

**B.    RULINGS UNDER REVIEW:**

This is an interlocutory appeal from an order of the district court (Honorable Richard W. Roberts), entered November 4, 2015, denying appellant's motion to dismiss the indictment. (Appx:739). In this appeal, appellant contends that the double jeopardy provision of the extradition treaty between the United States of America and the Kingdom of Belgium bars prosecution for the offenses charged in the indictment.

**C.    RELATED CASES**

This case has not previously been before this Court and there are no related cases.

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTES, GUIDELINES, AND RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Mr. Trabelsi's Arrest, Charges and Conviction in Belgium . . . . . . . . . . . . 3

II.     United States Charges and Extradition Proceedings . . . . . . . . . . . . . . . . . . 5

III.    Mr. Trabelsi's Motion to Dismiss Indictment . . . . . . . . . . . . . . . . . . . . . . 10

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.     The District Court Erred in Finding that Great Deference Should be
        Given to the Belgian Authorities' Decision Regarding Mr. Trabelsi's
        Double Jeopardy Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    The District Court Erred in Finding that the *Blockburger* Test
        Should be Used When Comparing International Offenses . . . . . . . . . . . . . 23

IV.     Even Under the *Blockburger* Test, the District Court Erred in Finding
        that the Charges in the Indictment Were Not the Same as the Offenses
        Charged in Belgium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

A.     Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.     United States Nationals, Interests and Designations . . . . . . . . . . . 44

C.     Breadth of the Charged Conspiracies . . . . . . . . . . . . . . . . . . . . . . 50

V.    Dismissal of the Indictment is the Appropriate Remedy . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF LENGTH

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES                                                      PAGE

*Abney v. United States*, 431 U.S. 651 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) . . . . . . . . . . . . . . 19

*Blockburger v. United States*, 284 U.S. 299 (1932)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 15, 23, 25, 26, 27, 29, 35, 40, 47

*Braverman v. United States*, 317 U.S. 49 (1942) . . . . . . . . . . . . . . . . . . . . . . . 57

*Brown v. Ohio*, 432 U.S. 161 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Casey v. Dep't of State*, 980 F.2d 1472 (D.C. Cir. 1992) . . . . . . 18, 19, 20, 21, 22

*Cosgove v. Winney*, 174 U.S. 64 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244 (1991) . . . . . . . . . . . . . . 19

*Frisbie v. Collins*, 342 U.S. 519 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Johnson v. Browne*, 205 U.S. 309 (1907) . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 58

*Ker v. Illinois*, 119 U.S. 436 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
     372 U.S. 10 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485 (D.C. Cir. 2008) . . 17

*Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Archbold-Newball*, 554 F.2d 665 (5th Cir. 1977) . . . . . . . . . . 42

---

*Authorities principally relied upon are marked with an asterisk.

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . 50

*United States v. Coughlin*, 610 F.3d 89 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . 56

*United States v. Dixon*, 509 U.S. 688 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Duarte-Acero*, 208 F.3d 1282 (11th Cir. 2000) . . . . . . . . . . 2, 18

*United States v. Ginyard*, 511 F.3d 203 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . 1

*United States v. Glover*, 731 F.2d 41 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 2

*United States v. Jeong*, 624 F.3d 706 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 24

*United States v. Jurado-Rodriguez*, 907 F. Supp. 568 (E.D.N.Y. 1995) . . . . . . . 58

*United States v. Kelly*, 552 F.3d 824 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . 23

*United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . 52

*United States v. Merit*, 962 F.2d 917 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 19

*United States v. Miller*, 471 U.S. 130 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Mobile Materials, Inc.*, 881 F.2d 866 (10th Cir. 1989) . . . . . . . 55

*United States v. Rauscher*, 119 U.S. 407 (1886) . . . . . . . . . . . . . . . . . . . . . 17, 58

*United States v. Rezaq*, 899 F. Supp. 697 (D.D.C. 1995) . . . . . . . . . . . . . . . . . 25

*United States v. Sensi*, 879 F.2d 888 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . 19, 20

*United States v. Sulaiman Abu Ghayth*, No. 98-cr-1028 (S.D.N.Y.) . . . . . . . . . 54

*United States v. Travillion*, 759 F.3d 281 (3rd Cir. 2014) . . . . . . . . . . . . . . . . . 57

---

*Authorities principally relied upon are marked with an asterisk.

iv

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . 52

*Zhenli Ye Gon v. Holder*, 992 F. Supp.2d 637 (W.D. Va. 2014) . . . . . . . . . . . . 24

## STATUTES AND OTHER AUTHORITIES

United States Constitution, Fifth Amendment,
    Double Jeopardy Clause . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25, 49, 56, 57

8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

8 U.S.C. § 1189(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

18 U.S.C. § 1111(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

*18 U.S.C. § 2332(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

*18 U.S.C. § 2332a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

*18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 50

22 U.S.C. § 2656f(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Belgian Criminal Code Article 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Belgian Criminal Code Article 322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Belgian Criminal Code Article 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Belgian Criminal Code Article 324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Belgian Criminal Code Article 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 48

_____

*Authorities principally relied upon are marked with an asterisk.

v

*Belgian Criminal Code Article 520 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 48

*Belgian Act of July 29, 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Alain De Nauw & Franklin Kuty,
     *Manuel de Droit Pénal Spécial (Special Criminal Law Handbook)*
     (2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Bassiouni, *International Extradition: United States Law and Practice*
     (5th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Black's Law Dictionary 1150 (9th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . 24

*Extradition Treaty Between the United States of America and the
     Kingdom of Belgium S. Treaty Doc. No. 104-7 (Apr. 27, 1987)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 14, 15, 16, 17, 21, 41, 45

Foreign Relations Authorization Act, 1988 and 1989 . . . . . . . . . . . . . . . . 35

Immigration and Nationality Act,  § 212(a)(3)(B) . . . . . . . . . . . . . . . . . . . 35

Restatement (Third) of Foreign Relations Law § 476 . . . . . . . . . . . . . . . . 25

---

*Authorities principally relied upon are marked with an asterisk.

vi

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 15-3075

**UNITED STATES OF AMERICA,**

**Appellee,**

**v.**

**NIZAR TRABELSI,**

**Appellant.**

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

### BRIEF FOR APPELLANT

### JURISDICTION

The district court had jurisdiction over this criminal case under 18 U.S.C.

§ 3231.   A timely notice of appeal from the district court's November 4, 2015 order

denying Nizar Trabelsi's motion to dismiss the indictment on grounds, in part, of

double jeopardy was filed on November 6, 2015.   Although this Court normally

lacks jurisdiction to review a district court decision in the absence of a final

judgment, the nature of Mr. Trabelsi's claim gives the Court jurisdiction over this

interlocutory appeal.   *See United States v. Ginyard*, 511 F.3d 203, 208 (D.C. Cir.

2008) ("In *Abney* [*v. United States*, 431 U.S. 651, 659 (1977)], the Supreme Court held that an appeal from the denial of a pretrial motion to dismiss an indictment on double jeopardy grounds is . . . within the collateral-order exception to the final-judgment rule"); *United States v. Glover*, 731 F.2d 41, 42 n.1, 44 & n.7 (D.C. Cir. 1984) (order denying motion to prohibit retrial on double jeopardy grounds "is a 'final decision' for purposes of 28 U.S.C. § 1291") (citing *Abney*, 431 U.S. at 662); *see also United States v. Duarte-Acero,* 208 F.3d 1282, 1284 (11th Cir. 2000) (court has jurisdiction to hear interlocutory appeal of denial of motion to dismiss based on double jeopardy provision of international treaty).

## ISSUES PRESENTED FOR REVIEW

I.    Whether the district court erred in giving "great deference" to the decision of a foreign court regarding a double jeopardy treaty provision, a decision that was based in part on the law of the United States.

II.   Whether the district court erred in using a strict *Blockburger* analysis when comparing international offenses to offenses charged in the United States and determining if a double jeopardy treaty provision was violated.

III.  Whether, even under its *Blockburger* analysis, the district court erred in finding that Mr. Trabelsi was not charged in Belgium with the same offenses

2

that are charged in the United States, in violation of the double jeopardy

prohibition in the extradition treaty between the United States and Belgium.

## STATUTES, GUIDELINES, AND RULES

Pursuant to Federal Rule of Appellate Procedure 28(f), and D.C. Circuit Rule

28(a)(5), the pertinent statutes and rules are set forth in the attached Addendum.

## STATEMENT OF THE CASE

### I.    Mr. Trabelsi's Arrest, Charges and Conviction in Belgium.

On September 13, 2001, Mr. Trabelsi was arrested in Uccle, Belgium, on

suspicion of plotting a terrorist attack.   Police searched his apartment and allegedly

found a list of chemicals used in explosives and an Uzi submachine gun.   (Appx:

674).[1]   The police later searched a restaurant owned by the family of a

coconspirator and allegedly found two chemicals used in explosives.   *Id.*   On

September 14, 2001, Mr. Trabelsi was served with a Belgian arrest warrant,

charging him with conspiracy, destruction by explosion, possession of weapons of

war, and belonging to a private militia.   (Appx: 96).   He was charged along with

twelve other coconspirators.   (Appx: 142).   He was convicted, and on September

30, 2003, the Brussels criminal court sentenced him "to a term of ten years in prison

---

[1]"Appx:" refers to the Appendix of Appellant filed with this brief.   The transcript of the district court proceedings is referred to by date and page number, e.g., "Tr. 9/30/15 at ___."

3

for, among other things, having attempted to destroy the military base of

Kleine-Brogel with explosives . . . and having been the instigator of a criminal

association formed for the purpose of attacking people and property."  (Appx: 96).

As set forth in the decision of the Brussels Court of Appeal, affirming

Mr. Trabelsi's convictions on June 9, 2004, the charges against Mr. Trabelsi

included:

> A.   [Mr. Trabelsi] on an undetermined date between
> July 3, 2001, and September 14, 2001, tried to
> destroy, through an explosion, a building, bridge,
> levy, roadway, railroad track, lock, warehouse,
> worksite, hangar, ship, boat, car, truck, aircraft,
> work of art, construction, motor vehicle, in the case
> at hand the Kleine-Brogel military base, belonging
> to the Belgian State represented by the Minister of
> National Defense, the perpetrators having had to
> assume that one or more people were present at the
> time of the explosion, the resolution to commit the
> crime having been demonstrated by outside acts
> that form a beginning of performance of that crime
> and that were only suspended or only failed to
> achieve their aim due to circumstances outside the
> will of the perpetrators;
>
> * * *
>
> D.   [Mr. Trabelsi] between May 1, 2001, and October
> 3, 2001, being the instigator of an association
> formed for the purpose of attacking people or
> property, by the perpetration of crimes leading to
> imprisonment of twenty to thirty years, of fifteen to
> twenty years, or of ten to fifteen years (in the case at

4

hand, an association of people who, in one manner
or another, favored the project to carry out a
terrorist attack);

* * *

Q.     [Mr. Trabelsi] on an undetermined date between
       May 3, 2001, and October 1, 2001 in violation of
       Articles 1 and 2 of the law dated July 29, 1934,
       prohibited private militias, having created,
       contributed to or been part of a private militia or any
       other organizations of individuals whose purpose is
       to use force[.]

(Appx: 143-49).   Mr. Trabelsi was charged with having "committed the violations

or directly cooperated in the commission thereof; provided assistance, by any act, in

the commission thereof such that without his assistance, the crimes or offenses could

not have been committed; [and] through gifts, promises, threats, abuse of authority

or power, *conspiracy* or criminal deception, directly provoked the commission of

those crimes or offenses[.]"   (Appx: 142).   As the Brussels Court of Appeal noted,

the acts underlying the charges against Mr. Trabelsi were committed between July

14, 1998 and February 8, 2002, and constituted a "successive and continuous

demonstration of the same criminal intent . . . ."   (Appx: 152).

## II.     United States Charges and Extradition Proceedings.

On April 7, 2006, while Mr. Trabelsi was serving his sentence for the charges

in Belgium, the United States government obtained an indictment charging him with

the same offenses.   (Appx: 5).   The four-count indictment charged Mr. Trabelsi

with conspiracy to kill United States nationals outside of the United States, in

violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a) (Count One); conspiracy and

attempt to use a weapon of mass destruction against nationals of the United States

while such nationals were outside of the United States and against property used by

the United States and a department and agency of the United States, in violation of

18 U.S.C. §§ 2332a and 2 (Count Two); conspiracy to provide material support and

resources to a foreign terrorist organization -- namely, al Qaeda, in violation of 18

U.S.C. § 2339B (Count Three); and providing material support and resources to a

foreign terrorist organization -- namely, al Qaeda, in violation of §§ 2339B and 2

(Count Four).   (Appx: 2).   A superseding indictment (hereinafter "indictment"),

charging the same offenses, with minor changes in the wording of the allegations,

was returned on November 16, 2007.   (Appx: 29).

    On April 4, 2008, the government submitted a formal request for extradition

to Belgium.   (Appx: 483).   Mr. Trabelsi opposed his extradition because the

Extradition Treaty Between the United States of America and the Kingdom of

Belgium (hereinafter "Extradition Treaty" or "Treaty"), S. Treaty Doc. No. 104-7

(Apr. 27, 1987), prohibits extradition "when the person sought has been found

guilty, convicted or acquitted in the Requested State for the offense for which

extradition is requested." *Id.* at Article 5.

On November 19, 2008, the Chamber of the Court of First Instance of Nivelles held that the United States arrest warrant seeking Mr. Trabelsi's arrest and extradition on the charges in the indictment was enforceable "except regarding 'Overt Acts,' no. 23), 24), 25) and 26, listed in paragraph 10 of the 1st count and supposed to be repeated in support of the three other counts." (Appx: 612). Overt Acts 23 through 26 are the allegations directly related to the acts that occurred in Belgium and the plot to bomb Kleine Brogel -- renting an apartment in Brussels, buying chemicals in Belgium to be used to manufacture a bomb, scouting the Kleine Brogel base as a target, and moving the chemicals from Mr. Trabelsi's apartment in Brussels to a conspirator's restaurant. (Appx: 36).

On February 19, 2009, the Court of Appeal of Brussels affirmed the decision of the Court of First Instance of Nivelles, noting that the Belgian government had not appealed the portion of the decision excluding Overt Acts 23 through 26 from the charges for which extradition was authorized, and therefore, that portion of the lower court's opinion also remained enforceable. (Appx: 536, 569 (appeal does not address order refusing to render arrest warrant enforceable as to Overt Acts 23 through 26)). The decision of the Court of Appeal of Brussels was affirmed by the Belgian Court of Cassation on June 24, 2009, (Appx: 240), and Mr. Trabelsi's

7

appeals from the decision finding that the warrant was enforceable (for all of the charges excluding Overt Acts 23 through 26) were then exhausted. (Appx: 616).

At that point, the Belgian Minister of Justice had the discretionary authority to extradite Mr. Trabelsi to the United States for prosecution on the charges (excluding Overt Acts 23 through 26). (Appx: 660-61). Pursuant to Belgian procedure, the Belgian Minister of Justice sought advice from the Court of Appeal of Brussels on the issue of whether or not the Minister should exercise his discretion to extradite as authorized by the Court of First Instance of Nivelles. (Appx: 616). On June 10, 2010, the Court of Appeal issued an "Avis" (an advisory non-binding opinion) approving extradition as had been authorized by the court.[2] (Appx: 616). On November 23, 2011, the Belgian Minister of Justice granted the extradition. (Appx: 574). As permitted by Belgian procedure, Mr. Trabelsi appealed the Belgian Minister of Justice's decision, and on September 23, 2013, the Belgian Council of State issued an order rejecting Mr. Trabelsi's challenges to the Minister's decision. (Appx: 95).

Meanwhile, on December 23, 2009, while continuing to pursue available

---

[2]The November 19, 2008 decision of the Chamber of the Court of First Instance of Nivelles, which held that the arrest warrant was enforceable with the exclusion of Overt Acts 23 through 26, was not an "Avis," but an "Arrêt," a binding decision of the court that the Minister of the Justice was required to follow. (Appx: 616).

remedies in Belgium, Mr. Trabelsi filed an application with the European Court of

Human Rights (ECHR), arguing that extradition to the United States would violate

the Convention for the Protection of Human Rights and Fundamental Freedoms

(hereinafter "the Convention").   (Appx: 236).   While reviewing the application,

the ECHR issued an interim measure directing Belgium not to extradite

Mr. Trabelsi.   (Appx: 247-48).   Despite that order, on October 3, 2013, the Belgian

Minister of Justice transferred Mr. Trabelsi to the custody of agents of the Federal

Bureau of Investigation (FBI).   (Appx: 249-50).   As the transfer was taking place,

the Court of First Instance of Brussels issued an order directing that the transfer be

stopped, (Appx: 589-91), but as with the order from the ECHR, the Belgian

authorities ignored the order and transferred custody of Mr. Trabelsi.   The FBI then

brought him to the United States, where he made his initial appearance before the

district court below.   The following year, on September 4, 2014, the ECHR issued a

final judgment, finding that because the potential life sentence that Mr. Trabelsi

faces in the United States is irreducible, his extradition violated the Convention,

which prohibits inhuman or degrading treatment or punishment.   (Appx: 234,

264-68).   The ECHR also condemned Belgium's decision to extradite Mr. Trabelsi

prior to the issuance of its final judgment, in violation of the interim order of the

ECHR and the Convention.   (Appx: 268-70).

9

### III.     Mr. Trabelsi's Motion to Dismiss Indictment.

Following Mr. Trabelsi's arraignment on October 3, 2013, the government began producing voluminous discovery materials, including more than 61,000 pages of documents.   On September 15, 2014, while the discovery process was ongoing, Mr. Trabelsi filed a Motion to Dismiss Indictment for Violation of Extradition Treaty.   (Appx: 66).   The motion was based on three treaty violations:   (1) a violation of Article 5 of the Treaty, incorporating the doctrine of *non bis in idem* or double jeopardy, because Mr. Trabelsi was convicted in Belgium for the same offenses charged in the indictment; (2) a violation of Article 15 of the Treaty, incorporating the doctrine of speciality, because the Kingdom of Belgium refused extradition with regard to Overt Acts 23 through 26, which form the basis for Counts One and Two of the indictment; and (3) a violation of Article 6 of the Treaty, because Belgium extradited Mr. Trabelsi in violation of its domestic law.   *Id.*

At issue in this interlocutory appeal is only the violation of the *non bis in idem*, double jeopardy, provision because only the decision regarding this violation is subject to interlocutory appeal.   *See Abney*, 431 U.S. at 662 (order denying motion to dismiss on double jeopardy grounds subject to interlocutory appeal). Mr. Trabelsi reserves his right to appeal the remaining violations on direct appeal, if necessary.

The Article 5 violation occurred because Mr. Trabelsi was charged and convicted in Belgium of conspiring to bomb Kleine Brogel and contributing to and being part of al Qaeda, and then extradited to face the same charges in the United States.   The Belgian court's exclusion of Overt Acts 23 through 26 was designed to avoid a violation of Article 5 by prohibiting Mr. Trabelsi's prosecution for the same offenses.   Although the Belgian government understood that the evidence of the Kleine Brogel plot could be used against Mr. Trabelsi in the United States, the Belgian court decisions reflect a belief that by removing Overt Acts 23 through 26 (the Kleine Brogel allegations) from the offenses for which extradition was authorized, Mr. Trabelsi would not be tried of the same offenses that were charged in Belgium.   (Appx: 554, 612).   Because the offenses in the United States – not merely the evidence the government intends to use – are the same as those charged in Belgium, a violation of Article 5 occurred.[3]

On October 29, 2014, the government filed an opposition to Mr. Trabelsi's motion.   (Appx: 284).   The government made little effort to try to distinguish the United States charges from the Belgian charges, making only a vague reference to

---

[3]The doctrine of speciality provision in Article 15 of the Treaty prohibits the prosecution of Mr. Trabelsi for any offense other than the offenses for which Belgium extradited him.   The government's prosecution of Mr. Trabelsi for the al Qaeda Kleine Brogel conspiracy (as described in the overt acts excluded by the Belgian court) violates this provision because Belgium did not extradite him for such a prosecution.

11

the difference between a conspiracy and an attempt charge (without arguing that Mr. Trabelsi was not charged with conspiracy) and noting that the object of the conspiracies charged in the United States was to destroy by terrorist means "people, property, and interests of the United States of America, *wherever located*," (Appx: 292 (emphasis in original)), suggesting that the conspiracies charges in the United States are broader than those charged in Belgium.    The focus of the government's opposition was not distinguishing the offenses, but arguing that Mr. Trabelsi had no standing to challenge the indictment based on violations of the Treaty and that the court could not "second-guess" Belgium's decision to extradite.    (Appx: 284-315).

On January 9, 2015, Mr. Trabelsi filed a reply to the government's opposition, explaining that Mr. Trabelsi was charged in Belgium, as he is in the United States, with conspiracy.    (Appx: 319, 320-21).    Mr. Trabelsi also disputed the government's suggestion that he was charged in the United States with a broader conspiracy, noting the government's response to his Motion for Bill of Particulars, counsel's review of the discovery provided by the government, and the (to date undisputed) fact that the only evidence against him in this case is the same evidence of the al Qaeda Kleine Brogel plot relied on in Belgium.    (Appx: 322-24).    In addition, Mr. Trabelsi refuted the government's procedural claims.    (Appx: 325-47).

12

On September 30, 2015, the district court held a hearing on the motion to dismiss.    Counsel for Mr. Trabelsi argued that the charges in the United States were the same as the charges in Belgium.    Tr. 9/30/2015 at 36 ("While they're not word for word the same, it's essentially the same elements that needed to be proved:    That he was conspiring with Al-Qaeda to blow a bomb up in Kleine Brogel.").    Given the strength of that position, it is not surprising that, in response, the government again asked the court to focus on the procedural issue and its claim that there was no precedent for the court to address Mr. Trabelsi's Treaty claims or provide the requested remedy. *Id.* at 44-61.    With regard to distinctions between the Belgian and United States offenses, the government argued that the charges in the indictment focused on United States interests or property. *Id.* at 55.

On November 14, 2015, the district court issued a Memorandum Opinion and Order, denying the motion.    (Appx: 739).    The district court rejected the government's argument that Mr. Trabelsi lacked standing to raise violations of the Treaty, and rejected the government's argument that the court "cannot and should not second-guess Belgium's determination that extradition was proper."    (Appx: 744).    Nonetheless, giving "great deference" to the decision of the Belgian authorities, (Appx: 749, 763-64), the court denied the motion, finding that Mr. Trabelsi did not demonstrate "that the offenses charged in the superseding

13

indictment are the same offenses for which he was prosecuted in Belgium, and . . . cannot show that his extradition under the superseding indictment violates Articles 5, 6, or 15 of the Extradition Treaty[.]" (Appx: 739). The court used a strict *Blockburger* analysis to compare the United States and Belgian offenses. (Appx: 750-54). The court found that Counts One, Two and Three of the indictment were distinguishable from the charges in Belgium because they charged conspiracies while the Belgian offenses were attempts, (Appx: 758-59, 762), although the opinions from the Belgian courts demonstrate that he was charged with conspiracy in Belgium. The court also found that Count Two was different than the offense charged in Belgium because it required proof that the intended target was an American citizen or property, which was not required to prove the Belgian offense, (Appx: 759), although the American citizens and property that were the target of the United States offense (the Kleine Brogel base and personnel) were the same as the target of the Belgian offense. The court also distinguished Count Two from the Belgian offense by finding that an offense against United States property would not require a finding that a person would be present at the time of the attack, as required by the Belgian offense, (Appx: 759), although the charged United States offense alleged not only an attack against United States property, but also an attack against United States citizens. Finally, the court distinguished Counts Three and Four from

14

the Belgian offenses by finding that the Belgian offenses charged participation in an

organization, but did not require proof that the organization was an organization

designated as a terrorist organization by United States law as required for the United

States offense, (Appx: 762-63), although al Qaeda is the organization at issue in both

the United States and the Belgian offenses.

## SUMMARY OF ARGUMENT

Mr. Trabelsi was charged and convicted in Belgium of offenses arising out of

a plot to bomb the Kleine Brogel military base outside of Brussels, Belgium.   He is

charged by indictment here with the same offenses.   Because Mr. Trabelsi was

charged with and convicted in Belgium of the same offenses as charged in the

indictment, his extradition and prosecution in the United States violates the

Extradition Treaty between the United States of America and the Kingdom of

Belgium which prohibits such dual prosecutions.   When comparing the United

States and Belgian charges, the district court erred in both giving deference to the

decision of the Belgian authorities and using a strict *Blockburger* analysis.   The

court also erred in distinguishing the United States and Belgian charges based on a

finding that Mr. Trabelsi was not charged in Belgium with conspiracy, when Belgian

court records make clear that he was charged in Belgium with conspiracy.   The

same conspiracy was charged in Belgium as is charged in the United States, and this

conspiracy is not distinguishable – for purposes of the international double jeopardy

provision – based on the United States offenses requiring proof that the conspiracy

targeted American citizens or interests and proof that the material support at issue

was provided to an organization designated as a terrorist organization by the United

States.   Because neither the elements of the charged offenses nor the breadth of the

charged conspiracies distinguish the United States offenses from those charged in

Belgium, prosecution of the indictment violates the Extradition Treaty.   The

appropriate remedy for the violation is dismissal of the indictment.

## ARGUMENT

Article 5 of the Extradition Treaty provides:

> 1.  Extradition shall not be granted when the person
>     sought has been found guilty, convicted or acquitted
>     in the Requested State for the offense for which
>     extradition is requested.
>
> 2.  Extradition shall not be precluded by the fact that the
>     authorities in the Requested State have decided not to
>     prosecute the person sought for the acts for which
>     extradition is requested, or to discontinue any criminal
>     proceedings which have been instituted against the
>     person sought for those acts.

Extradition Treaty, S. Treaty doc. No. 104-7, 1987 WL 350379 (Apr. 27, 1987).

The prosecution of the indictment violates the first paragraph of this provision

16

because Mr. Trabelsi was charged, tried and convicted in Belgium for the offenses charged in the indictment.

## I.    Standard of Review.

The Supreme Court has held that "[a] treaty . . . is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.   And, when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."   *United States v. Rauscher*, 119 U.S. 407, 419 (1886); *see also Ker v. Illinois*, 119 U.S. 436, 443 (defendant brought to United States pursuant to extradition treaty comes "to this country clothed with the protection" conferred by extradition proceedings and treaty).   Just as the Court reviews issues of statutory interpretation *de novo*, this Court applies *de novo* review to a district court's interpretation of a treaty, such as the Extradition Treaty at issue here.[4]   *See McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d

---

[4]As the district court found, Mr. Trabelsi has standing to raise violations of the Extradition Treaty.   (Appx: 742-43 n.1).   The government argued below that Mr. Trabelsi lacked standing under the *Ker-Frisbie* doctrine, which holds that a defendant brought to court by force – not pursuant to a treaty – is not deprived of due process and cannot claim rights under an extradition treaty.   *Ker v. Illinois*, 119 U.S. 436, 444 (1886); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952).   As the district court found, *Ker-Frisbie* does not apply to defendants, like Mr. Trabelsi, who are brought before the court pursuant to an extradition treaty.   (Appx: 743 n.1).

17

485, 488 (D.C. Cir. 2008) (reviewing *de novo* district court's interpretation of 1955

Treaty of Amity, Economic Relations, and Consular Rights); *see also Duarte-Acero,*

208 F.3d at 1284 ("We review *de novo* a district court's decision to deny a motion to

dismiss based on double jeopardy grounds[, based on international treaty

provision,]because it presents a pure question of law.").

## II.    The District Court Erred in Finding that Great Deference Should be Given to the Belgian Authorities' Decision Regarding Mr. Trabelsi's Double Jeopardy Claim.

Although the district court correctly rejected the government's argument that

the court could not revisit the decision of Belgian authorities denying Mr. Trabelsi's

Article 5 double jeopardy claim, the district court improperly gave "great deference"

to the Belgian decision.    (Appx: 746, 749, 764).    In doing so, the district court

relied on this Court's decision in *Casey v. Dep't of State*, 980 F.2d 1472, 147 (D.C.

Cir. 1992).    The decision in *Casey*, however, is inapplicable because it addressed a

claim under a treaty's dual criminality provision, not a double jeopardy claim.

*Casey*, 980 F.2d at 1475.    A dual criminality treaty provision requires a requested

state to determine whether or not the conduct charged in the seeking jurisdiction

would constitute criminal conduct in the requested state.    *Id.*    The determination of

the dual criminality question – "does the conduct constitute a crime in the requested

state?" – is based solely on the law of the requested state.    In contrast, the double

18

jeopardy question – "was the same crime charged in both the requesting state and the requested state?" – is not determined based solely on the law of the requested state.

As the district court noted, (Appx: 746), in *Casey* this Court stated:

> The government . . . argues that an extradition decision is *entirely* within the discretion of the extraditing country. The government may be correct.   But Casey points out that some American courts, including this circuit, have entertained claims on the merits that a foreign court's extradition decision violated a treaty.   *See, e.g., United States v. Sensi*, 879 F.2d 888, 893 (D.C. Cir.1989) (rejecting a dual criminality claim on the merits, while reserving the jurisdictional question); [*United States v.*] *Merit*, 962 F.2d [917,] 921-22 & n. 4 [(9th Cir. 1992) ("Although the government argues that Merit lacks standing to protest his extradition as a violation of the treaty, in this circuit 'the person extradited may raise whatever objections the rendering country might have.'" (citations omitted))].
>
> Nevertheless, it seems clear to us that, at a minimum, *Johnson* [*v. Browne*, 205 U.S. 309 (1907),] means that an American court must give great deference to the determination of the foreign court in an extradition proceeding.   This deference is necessary to further international comity—a goal the Supreme Court has emphasized in a variety of contexts.   *Cf. E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (applying a presumption against the extraterritorial application of United States laws); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20-22, 83 S.Ct. 671, 677-78, 9 L.Ed.2d 547 (1963) (applying a presumption that congressional statutes do not violate the laws of foreign nations or international law); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11

19

> L.Ed.2d 804 (1964) (limiting judicial review of the acts of
> sovereign nations through the act of state doctrine).
> Surely, a foreign court's holding as to what that country's
> criminal law provides should not lightly be
> second-guessed by an American court—if it is ever
> reviewable.   And the foreign court's understanding of the
> nature of the American charge is, in truth, inextricably
> intertwined with its reading of its own law.

*Casey*, 980 F.2d 1476-77.   This language, like the opinions cited by *Casey*, applies

to the decisions of foreign courts regarding foreign law.   The double jeopardy issue

presented here is not such a decision.[5]

The *Casey* court found support for giving deference to a foreign court's

decision regarding foreign law in *Johnson*.   In *Johnson*, the Supreme Court

addressed a doctrine of speciality claim[6] and noted that a Canadian court had found

that the defendant was not extraditable for the offense at issue because it was not a

criminal offense covered by the treaty (a dual criminality claim).   205 U.S. at 316.

---

[5] Moreover, the *Casey* majority held only that the district court did not have jurisdiction because the defendant had not yet been extradited, and left open the possibility for the defendant to challenge the extradition decision after he was brought to the United States.   *Id.* at 1478 ("If Casey is ultimately extradited to the United States, he can then challenge his extraditability and thereby, in a timely manner, test the limits on our judicial review of the issues determined by the Costa Rican courts.").

[6] The doctrine of speciality, contained in most extradition treaties, including the treaty between the United States and Belgium, provides that "once extradited, a person can be prosecuted only for those charges on which he was extradited." *United States v. Sensi*, 879 F.2d 888, 892 (D.C. Cir. 1989).

The *Johnson* court found that the treaty at issue expressly provided that whether an

offense was a criminal offense covered by the treaty (that is whether it was an

offense punishable in the requested state) was a determination for the requested

state. *Id.* Thus, *Johnson's* meaning as interpreted by *Casey* applies to the

determination of whether or not an offense is extraditable (the dual criminality

determination) – not whether or not a defendant has previously been charged with or

convicted of the same offense. As explained in the concurring opinion in *Casey*,

courts "must refrain from inquiring into whether the 'dual criminality' principle,

which requires that the offenses for which Casey was sought by the United States

government also constitute crimes in Costa Rica, has been satisfied." *Id.* at 1479

(Wald, J. concurring).

In contrast, the decision of the Belgian authorities on the double jeopardy

issue is not binding and does not deserve "great deference" because it is not a

decision by a foreign government regarding the law of that foreign country.

As the district court recognized:

> The United States and Belgium are equal partners under
> the Extradition Treaty. Both countries have agreed to
> follow a particular set of procedures and restrictions when
> seeking to extradite individuals from one country to the
> other to be brought up on criminal charges. In light of
> this equal and solemn partnership, the United States must
> have at least some ability and obligation to ensure that the
> terms and standards of the Extradition Treaty are obeyed

21

> in each extradition. Any consideration of a defendant's claims under Article 5 will of course involve one sovereign examining the criminal law of both nations. Thus, it seems that the United States and Belgium may be on equal footing to consider a defendant's Article 5 claims.

(Appx: 748-49). Despite recognizing that the double jeopardy determination is not a decision based solely on the law of the requested state, the district court found that *Casey's* "cautionary language" applied and deference was owed to the Belgian authorities' decision on the double jeopardy question at issue here. (Appx: 746-49, 764). The district court failed to recognize the distinction between the dual criminality determination and the double jeopardy determination and thus failed to recognize that *Casey's* cautionary language does not suggest deference to anything beyond Belgium's interpretation of Belgian law.

The district court also failed to recognize that the Belgian authorities in fact intended to preclude prosecution for the conduct charged here and extradited based on the apparent belief that excluding the overt acts relating to Kleine Brogel (Overt Acts 23 through 26) would prevent Mr. Trabelsi from being convicted of the same conspiracy charged in Belgium. Upon excluding the Kleine Brogel overt acts from the offenses for which extradition was authorized, the Belgian authorities expressed the belief that "[t]he purpose of the offenses considered by the American authorities is broader than the reference alone to the attempt to destroy by explosive the

22

Kleine-Brogel base, and is based on elements that have nothing to do with the

Belgian file (but in particular the declarations of Djamel BEGHAL, Richard REID,

etc.)." (Appx: 554). This is not an accurate description of the charges here. The

Belgian authorities apparently misunderstood the scope of the United States charges

and prosecution. As submitted by Mr. Trabelsi below (and not disputed by the

government), Mr. Trabelsi is not charged with, nor will there be any evidence

presented at trial regarding, any plot other than the Kleine Brogel plot or any plot

related to Djamel Beghal or Richard Reid. Because the Belgian authorities

misunderstand the conspiracy charged in the United States, it would be particularly

inappropriate to defer to the Belgian decision regarding the Treaty's double jeopardy

provision and the charges in the United States.

## III.  The District Court Erred in Finding that the *Blockburger* Test Should be Used When Comparing International Offenses.

When determining whether the Double Jeopardy Clause of the United States

Constitution is violated, courts apply the standard set out in *Blockburger v. United*

*States*, 284 U.S. 299 (1932). This "test 'inquires whether each offense contains an

element not contained in the other; if not they are the "same offence" and double

jeopardy bars additional punishment and successive prosecution.'"  *United States v.*

*Kelly*, 552 F.3d 824, 835 (D.C. Cir. 2009) (Rogers, J. concurring) (quoting *United*

*States v. Dixon*, 509 U.S. 688, 696 (1993)). As the Court stated in *Blockburger*,

23

"where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.

At issue here, however, is not a constitutional Double Jeopardy Clause question of comparing two domestic offenses. At issue here is a Treaty double jeopardy provision and the comparison of international offenses. As one court noted:

> such treaty restrictions derive from the fundamental norm of *non bis in idem* (from the Latin maxim "*nemo debet bis vexari pro eadem causa*") which goes back to ancient times and is found throughout the civil as well as the common law. . . . Perhaps because of the diverse origins of the rule, however, no established solution exists for the "famous problem of identity of offenses for application of *non bis in idem*[.]"

*Sindona v. Grant*, 619 F.2d 167, 177 (2d Cir. 1980) (citations omitted); *see also Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 649 (W.D. Va. 2014) ("The Latin term *non bis in idem* means 'not twice for the same thing,' Black's Law Dictionary 1150 (9th ed. 2009), and is a principle of international law, akin to the Fifth Amendment's prohibition on double jeopardy." (citing *United States v. Jeong*, 624 F.3d 706, 711 (5th Cir. 2010)); Bassiouni, *International Extradition: United States Law and Practice* (5th ed.) at 749.

24

Although some treaty double jeopardy provisions prohibit dual prosecutions based on the same acts, the Treaty between the United States and Belgium – and most United States extradition treaties – prohibits dual prosecutions for the same offenses.   The standard for comparing international offenses, however, necessarily must be more flexible than the standard for applying the Double Jeopardy Clause and comparing domestic offenses.   *Sindona*, 619 F.2d at 178 (approving the adoption of "a modified and more flexible test [than the *Blockburger* test] of whether the same conduct or transaction underlies the criminal charges"); *see also* Restatement (Third) of Foreign Relations Law § 476, comment (c) ("In general, it is not the denomination of the crime but the act constituting the crime that determines whether the principle of double jeopardy – *non bis in idem* in international usage – is applicable.").   Because different countries will not delineate the same offenses with similar language, courts must look beyond the elements of the offenses and apply "a modified and more flexible test of whether the same conduct or transaction underlies the criminal charges in both transactions."   *Id.* at 178 (quotation omitted) (rejecting application of *Blockburger* test to treaty provision as "wholly inappropriate"); *see also United States v. Rezaq*, 899 F. Supp. 697, 703 n.6 (D.D.C. 1995) ("*Blockburger* is arguably 'inappropriate' in extradition case").

25

Here, the district court erred in applying a strict *Blockburger* test, (Appx: 750-54), without accounting for the inherent differences between international offenses.   Referring to Paragraph 4(a) of Article 2 of the Treaty, the district court found "support [for] the notion that 'offenses' within the context of the treaty should be defined by their statutory elements rather than by the underlying conduct." (Appx: 754, n.6).   Mr. Trabelsi does not dispute that the focus must be on the elements of the charges offenses, not merely the underlying conduct, and on whether the offenses are the same, not merely whether the evidence is the same.   Article 2 of the Treaty, however, supports a modified *Blockburger* test when comparing the elements of the offenses.   Article 2 does not make a distinction between statutory elements and underlying conduct, as the district court suggested; rather it distinguishes between "essential" and "non-essential" elements.   Article 2 contains the Treaty's dual criminality clause, and Paragraph 1 of Article 2 defines an "extraditable offense" as an offense that "is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty."   The paragraph referenced by the district court, Paragraph 4(a), provides that "[i]n determining whether an offense is an extraditable offense [that is whether the offense is a crime in the requested state], the Contracting States [] shall consider only the *essential* elements of the offense punishable under

26

the laws of both states[.]" (Emphasis added). Thus, the focus is on the "essential" elements.

As the Treaty provides in Paragraph 4(b), when comparing offenses, the court "shall not consider as an essential element of an offense punishable in the United States an element such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, since such an element is for the purpose of establishing jurisdiction in the United States federal court[.]" Similarly, as discussed below, elements of the charged offenses that require proof that the target of the charged attack was an American citizen or interest or that the criminal organization at issue had been designated by the United States as a terrorist organization, should not be considered essential, or distinguishing, elements when comparing offenses for purposes of the Treaty's double jeopardy provision. Instead, the focus should be on whether the target (Kleine Brogel) and organization (al Qaeda) at issue are the same in both the United States and the Belgian charges. When the only distinction is the characterization of the target as a United States citizen or interest, or the characterization of the organization as one designated as a terrorist organization by the United States, the offenses are the same. Support for this reading of the Treaty and use of a modified *Blockburger* test also is found in Paragraph 4(c), which provides that, when making the dual criminality

27

determination, the parties "shall disregard that the respective laws do not place the offense within the same category of offenses or describe the offense by the same terminology."

The comparison of the offenses done by the Belgian court also supports this analysis. The November 19, 2008 decision of the Court of First Instance of Nivelles, which rendered the United States warrant enforceable in Belgium, found that the identification of the targets as American citizens or interests is not sufficient to distinguish the offenses. That court found:

> It does not seem reasonable to consider that these offenses are distinguishable from the offenses for which NIZAR TRABELSI was convicted in Belgium for the only reason that his bombing project was aiming for the Kleine-Brogel American military facilities and the United States nationals that might have been inside, while these facilities are integrated in the Belgian military base which established in it and that the interested party had already been convicted for all of the acts that he committed on Belgian soil regarding this project, for the damage that he already could have caused to the nearby Belgian military infrastructures and the fatal injuries or not that he could have caused to Belgian or other non-American victims.

(Appx: 612).[7]

_____

[7] As noted above the Belgian court went on to exclude the Kleine Brogel overt acts from the offenses for which extradition was authorized, finding that "[in] virtue of the _ne bis in idem_ principle, the arrest warrant for the purpose of extradition granted on November 16, 2007, by the competent legal authority of the United States of America therefore cannot be rendered enforceable with regard to the above

28

Use of a strict *Blockburger* analysis simply does not make sense in the context of international offenses and the Treaty.   For example, every United States offense that can be applied extraterritorially will have a jurisdictional element that allows the United States to extend its reach beyond the borders of the United States, generally by requiring a connection to a United States national, property or interest.   No Belgian offense will require such a connection to a United States interest but might well contain a non-essential element specific to Belgian law or jurisdiction.   If such non-essential elements could distinguish offenses for purposes of the double jeopardy provision of the Treaty, the provision would be meaningless because it would likely never be applicable.

## IV.    Even Under the *Blockburger* Test, the District Court Erred in Finding that the Charges in the Indictment Were Not the Same as the Offenses Charged in Belgium.

Regardless of the whether a strict *Blockburger* test is used, the offenses charged in Belgium and the United States are the same.   In Belgium, Mr. Trabelsi was charged with twelve offenses.   (Appx: 142-50).   As to each of these offenses, the Belgian government charged that Mr. Trabelsi "committed the violations or directly cooperated in the commission thereof; provided assistance, by any act, in the commission thereof such that without his assistance, the crimes or offenses could

---

mentioned 'Overt Acts'[23 through 26.] "   (Appx: 612).

not have been committed; [and] through gifts, promises, threats, abuse of authority or power, *conspiracy* or criminal deception, directly provoked the commission of those crimes or offenses[.]"  (Appx: 142 (emphasis added)).

Charge A in Belgium charged that Mr. Trabelsi:

> on an undetermined date between July 3, 2001, and September 14, 2001, tried to destroy, through an explosion, a building, bridge, levy, roadway, railroad track, lock, warehouse, worksite, hangar, ship, boat, car, truck, aircraft, work of art, construction, motor vehicle, in the case at hand the Kleine-Brogel military base, belonging to the Belgian State represented by the Minister of National Defense, the perpetrators having had to assume that one or more people were present at the time of the explosion, the resolution to commit the crime having been demonstrated by outside acts that form a beginning of performance of that crime and that were only suspended or only failed to achieve their aim due to circumstances outside the will of the perpetrators.

(Appx: 143).   This offense (charge A) was charged under Articles 520, 510 and 51 (attempt) of the Belgium Criminal Code.   Article 520 provides:

> Those who destroy or attempt to destroy, by bomb, buildings, bridges, dams, highways, railroads, waterways, shops, construction sites, hangers, ships, boats, cars, railway cars, aircrafts or other civil engineering structures, constructions or motor vehicles will be punished by the penalties set forth in the preceding articles and based on the distinctions established within them.

(Appx: 730).   Article 510 (referred to in Article 520 as a "preceding article") provides:

30

> Those who set fire to buildings, bridges, dams, highways,
> railroads, waterways, shops, construction sites, hangers,
> ships, boats, cars, railway cars, aircrafts or other civil
> engineering structures, constructions or motor vehicles
> will be punished (by penal servitude) of fifteen to twenty
> years, if the perpetrator must have assumed that there
> would be one or several people present at the moment of
> the fire.

(Appx: 729).   And Article 51 provides:

> An attempt is punishable when the will to commit the
> crime or offence has been demonstrated by observable
> acts that constitute the beginning of the execution of the
> crime or offence and that was suspended or failed in its
> purpose only because of circumstances outside the control
> of the perpetrator[.]

(Appx: 729).

The offense charged in Belgian charge A is the same as the offense charged in

Count One, charging conspiracy to kill United States National Outside of the United

States, in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a), and the offense charged

in Count Two, charging conspiracy and attempt to use a weapon of mass destruction,

in violation of 18 U.S.C. §§ 2332a and 2.   Section 2332(b)(2) provides:

> Whoever outside the United States attempts to kill, or
> engages in a conspiracy to kill, a national of the United
> States shall . . . in the case of a conspiracy by two or more
> persons to commit a killing that is a murder as defined in
> section 1111(a) of this title, if one or more of such persons
> do any overt act to effect the object of the conspiracy, be
> fined under this title or imprisoned for any term of years or
> for life, or both so fined and so imprisoned.

31

Section 2332a provides:

> A person who, without lawful authority, uses, threatens, or
> attempts or conspires to use, a weapon of mass destruction
> . . . against a national of the United States while such
> national is outside of the United States; . . . [or] against
> any property that is owned, leased or used by the United
> States or by any department or agency of the United States
> whether the property is within or outside of the United
> States . . shall be imprisoned for any term of years or for
> life, and if death results, shall be punished by death or
> imprisoned for any term of years or for life.

Because Belgian charge A and Counts One and Two of the indictment charge the

same conspiracy to destroy through explosion the Kleine Brogel military base while

people are present, these are the same offenses.

In Belgium, charge D charged Mr. Trabelsi with:

> between May 1, 2001, and October 3, 2001, being the
> instigator of an association formed for the purpose of
> attacking people or property, by the perpetration of crimes
> leading to imprisonment of twenty to thirty years, of
> fifteen to twenty years, or of ten to fifteen years (in the
> case at hand, an association of people who, in one manner
> or another, favored the project to carry out a terrorist
> attack)[.]

(Appx: 145).   Charge D was charged under Articles 322, 323 and 324 of the

Belgian Criminal Code.   Article 322 provides:

> Any association formed for the purpose of causing injury
> to a person or property is a crime or offence, which exists
> simply by the gang being organized.

32

(Appx: 729).   Article 323 provides:

> (If the association's purpose is the perpetration of crimes
> punishable by life imprisonment or imprisonment of ten to
> fifteen years or more, the instigators of this association,
> the leaders of this gang and those who would have
> exercised any command whatsoever, will be punished
> with imprisonment of five to ten years.)   <L
> 2003-01-23/42, Art. 58, 040; Effective: 03-13-2003>
>     They shall be punished by imprisonment of two to
> five years if the association was formed to commit other
> crimes, and by imprisonment of six months to three years
> if the association was formed to commit offences.

(Appx: 729).   Article 324 provides:

> Any other individuals belonging to the association and
> those who may have knowingly and intentionally
> provided to the gang or its divisions weapons, munitions,
> instruments of crime, housing, shelter or meeting place,
> will be punished:
>     In the first case listed by the preceding article, by
> imprisonment of six months to five years;
>     In the second case, by imprisonment of two months
> to three years;
>     In the third case, by imprisonment of one month to
> two years.

(Appx: 729).

In Belgium, charge Q charged Mr. Trabelsi with:

> on an undetermined date between May 3, 2001, and
> October 1, 2001 in violation of Articles 1 and 2 of the law
> dated July 29, 1934, prohibited private militias, having
> created, contributed to or been part of a private militia or
> any other organizations of individuals whose purpose is to

33

use force[.]

(Appx: 149).   Charge Q was charged under the Belgian Act of July 29, 1934.

Article 1 of this law provides:

> All private militias or any organization of individuals
> whose purpose is to use force or fill in for the army or the
> police, to interfere with their actions or substitute them,
> are forbidden.

(Appx: 732).   And Article 2 of this law provides:

> Those who create a militia or an organization in violation
> of Article 1 . . . those who lend them their support and
> those who participate will be punished by imprisonment
> of one month to one year and a penalty fee of 26 francs to
> 300 francs, or only one of these penalties, without
> prejudice to the application of any more severe criminal
> provisions.

(Appx: 732).

The Belgian offenses in charges D and Q are the same as the offenses charged

in Counts Three and Four of the indictment, which charge conspiracy to provide and

providing material support to a foreign terrorist organization, "namely al Qaeda," in

violation of § 2339B.   (Appx: 38-39).   Section 2339B provides:

> Whoever knowingly provides material support or
> resources to a foreign terrorist organization, or attempts or
> conspires to do so, shall be fined under this title or
> imprisoned not more than 20 years, or both, and, if the
> death of any person results, shall be imprisoned for any
> term of years or for life. To violate this paragraph, a
> person must have knowledge that the organization is a

34

designated terrorist organization (as defined in subsection
(g)(6)), that the organization has engaged or engages in
terrorist activity (as defined in section 212(a)(3)(B) of the
Immigration and Nationality Act), or that the organization
has engaged or engages in terrorism (as defined in section
140(d)(2) of the Foreign Relations Authorization Act,
Fiscal Years 1988 and 1989).

Because Belgian offenses D and Q and Counts Three and Four of the indictment

charge the same conspiracy to participate and participating in or supporting al

Qaeda, these offenses are the same.

While acknowledging that there are "significant similarities" between the

elements of the offenses charged in the United States and the elements of the

offenses charged in Belgium, the district court, using the *Blockburger* test, found

that the offenses were not the same.   (Appx: 754).   The district court made this

finding based on several perceived differences between the United States and

Belgian charges, summarized here and discussed in more detail below.

First, the court found that Count One (conspiracy to kill United States

nationals outside the United States), Count Two (conspiracy and attempt to use a

weapon of mass destruction against United States nationals outside the United States

and against property used by the United States) and Count Three (conspiracy to

provide material support to a foreign terrorist organization) charge Mr. Trabelsi with

conspiracy, whereas he was charged in Belgium with attempt to attack Kleine

35

Brogel and substantive participation in al Qaeda, with no proof of a criminal

agreement required in Belgium.   As explained further below in subsection A, this

finding was erroneous because – as the opinions from the Belgian courts confirm

and the government did not dispute – Mr. Trabelsi was charged in Belgium with

conspiracy to commit the charged offenses.   Second, the district court found that

Count Two (conspiracy and attempt to use a weapon of mass destruction against

United States nationals outside the United States and against property used by the

United States) was distinguishable because it required proof that the offense was

against United States nationals or United States interests, and the Belgian offense

did not require proof of a United States target, while the portion of Count Two

charging an attack against United States property did not require proof that

Mr. Trabelsi knew a person would be present, as required by the Belgian offense.

As explained further below in subsection B, this finding was erroneous not only

because jurisdictional elements requiring a connection to United States nationals or

interests are not the type of essential elements sufficient to distinguish charges or

convictions in a foreign court, but also because Count Two, like the Belgian offense,

charges an offense against persons and property.   The court also found that Counts

Three (conspiracy to provide material support) and Four (providing material

support) were distinguishable from the Belgian charges because they require proof

36

that support was given to an organization designated as a terrorist organization by the United States, whereas the Belgian offenses unsurprisingly did not require proof that the organization was designated as such by the United States or a connection to terrorism.   This finding was erroneous, as explained further in subsection B below, because both the United States and the Belgian charges accuse Mr. Trabelsi of participation in and supporting an organization intent on attacking people or property and using force – that is al Qaeda.   Finally, the district court, without making any specific findings suggested the breadth of the conspiracy charged in the United States may be sufficient to distinguish the United States charges from the Belgian charges.   As explained further in subsection C below, the conspiracy charged in the United States is no broader than the conspiracy charged in Belgium, and even if charged more broadly, the United States conspiracy is not a different offense than the conspiracy charged in Belgium.

### A.  Conspiracy

The district court began its opinion by acknowledging that Mr. Trabelsi was "convicted in Belgium of *conspiracy*, explosives, firearms, and other offenses and sentenced to ten years imprisonment."   (Appx: 740 (emphasis added)).   When comparing the Belgian and United States offenses, however, the court found: "Count I differs from Count A in that Belgium charged Trabelsi with the *substantive*

*offense* of attempting to bomb a Belgian military base, while the United States

charges Trabelsi with *conspiring* to kill United States citizens wherever located,

including citizens at that military base and elsewhere around the world." (Appx:

756 (emphasis added)).

The court recognized the language contained in the Belgium charges alleging

that Mr. Trabelsi "committed the violations or directly cooperated in the

commission thereof; provided assistance, by any act, in the commission thereof such

that without his assistance, the crimes or offenses could not have been committed;

[and] through gifts, promises, threats, abuse of authority or power, *conspiracy* or

criminal deception, directly provoked the commission of those crimes or

offenses[.]" (Appx: 142 (emphasis added); 756-57 n.7).   Nonetheless, without

citation (and not based on any argument from the government), the court dismissed

this conspiracy allegation as a description "in the aggregate [of] multiple bases of

criminal liability under which the multiple offenses were committed by the multiple

defendants[,]" and found (again without citation and not based on any government

argument) that "[f]or purposes of comparing statutory elements, this language does

not transform any individual substantive charge into a standalone conspiracy charge

against Trabelsi." (Appx: 757 n.7).   As set forth in the decision from the Belgian

Court of Appeal, each of the offenses charged in Belgium was charged as a

38

substantive offense and as a conspiracy.    That the conspiracy allegation was one of

several "bases of criminal liability" does not alter the fact that the conspiracy

charges were filed and the prosecution of those charges were completed in Belgium,

resulting in Mr. Trabelsi's conviction.

The September 30, 2003 judgment on the charges against Mr. Trabelsi in

Belgium (which was submitted to the district court as Exhibit D attached to the

motion to dismiss) indisputably demonstrates that Mr. Trabelsi was charged with

conspiracy in Belgium.   (Appx: 407)    Under the heading "CONCERNING THE

CHARGES RELATED TO CRIMINAL CONSPIRACY," the Belgian court found

the Belgian prosecutor had proven "the existence in Belgium of a pool of very

militant Muslim fundamentalists who recruited volunteers in order to send them to

receive military training in Afghanistan under the Taliban, so that they could later be

sent to various war fronts (Afghanistan, Chechnya . . .), or to 'smuggle' them into

Europe to form either dormant or active anti-Western terrorist network cells[.]"   *Id.*

The judgment also specified that the charges included two types of conspiracies, one

to commit forgeries to help send recruits for training and another intended to

promote "the plot to carry out a suicide attack" (or "terrorist attack") intended to

harm people or property.   *Id.*   The Belgian court found:

> That, on reading the record of proceedings compiled in
> this case, however, there can be no doubt that, by means of

fake documents, the eventual conspiracy ultimately
intended to promote the creation of armed groups who
would engage in violence, either as part of a wider conflict
involving fundamentalist phalanges or as part of a
subversive movement;

Thus, such a group would be trained to carry out attacks
on property and people;

It follows from the confessions of defendant Trabelsi that
there indeed existed in Belgium a criminal conspiracy
intended to commit a terrorist attack, even if he denies that
he was the instigator.

*Id.*   The Brussels Court of Appeal, on appeal from the judgment of the lower court,

also made clear that the conspiracy in Belgium was the same al Qaeda conspiracy

charged here: "Whereas the acts committed by this accused are exceptionally

serious, the latter having been part of a criminal association, resulting directly from

the Al Qaeda movement -- he was thus trained in explosives in Afghanistan -- and

whose purpose was to carry out a terrorist attack in [Belgium.]"   (Appx: 224).

Even under the district court's strict *Blockburger* analysis, the conspiracies

charged in Counts One, Two and Three were the same as the conspiracies charged in

Belgium.   Belgium specifically accused Mr. Trabelsi of participating in the plot to

bomb Kleine Brogel through conspiracy (charge A) and conspiring to participate in

or support al Qaeda (charges D and Q).

40

Moreover, the Extradition Treaty demonstrates that an "association" charged in Belgium is the same as a "conspiracy" charge in the United States. Paragraph 3(b), of Article 2 of the Treaty provides: "The following shall also be an extraditable offense . . . an 'association of wrongdoers' formed to commit any of the offenses described in paragraph 1 [ -- offenses punishable under the law of both states by a period of one year or more --] under the laws of Belgium, or a conspiracy to commit any such offense as provided by the laws in the United States." This provision confirms that a conspiracy charge in the United States is the same offense as an "association of wrongdoers" charge in Belgium. Charge D in Belgium specifically charged Mr. Trabelsi with participation in an "association formed for the purpose of attacking people or property." This is the "association of wrongdoers" referenced in the Treaty as the equivalent of a conspiracy charge. *See* Alain De Nauw & Franklin Kuty, *Manuel de Droit Pénal Special (Special Criminal Law Handbook)* 171-76 (2014).[8]

The district court's finding that Mr. Trabelsi was not charged with conspiracy in Belgium is clearly refuted not only by the Belgian court decisions, but also by the government's arguments below: the government never argued that Mr. Trabelsi

---

[8]For the Court's convenience, this excerpt and an English translation of the excerpt are contained in the attached addendum of pertinent statues and regulations submitted pursuant to Local Rule 28(a) (5).

41

was not charged with conspiracy in Belgium.    In the motion, Mr. Trabelsi submitted

that he was charged in Belgium not merely with substantive offenses, but with

conspiracy to commit terrorist acts on behalf of al Qaeda.    (Appx: 84).    In its

opposition, the government did not dispute that Mr. Trabelsi was charged with

conspiracy in Belgium, but referenced a case distinguishing overt acts from the

charge of conspiracy.    (Appx: 301).    Concerned that this argument suggested –

without arguing – that the distinction between the Belgian offenses and the United

States offenses was that conspiracy was charged in Belgium but not the United

States, in reply, Mr. Trabelsi submitted:

> In part, the government seems to suggest that because Mr. Trabelsi was charged with the substantive offense of planning to attack Kleine Brogel in Belgium, he can be charged in the United States with conspiracy to attack Kleine Brogel, and the government may use the substantive evidence of the attempted attack at Kleine Brogel to prove that conspiracy. *See* [(Appx: 301),] Gov't Opp. at 18 (citing *United States v. Archbold-Newball*, 554 F.2d 665, 684 (5th Cir. 1977)). Mr. Trabelsi, however, was not merely charged with a substantive offense in Belgium – he was charged with conspiracy to attack Kleine Brogel. *See* [(Appx: 142),] Exhibit B at 18.   The government makes no mention of this fact and no attempt to distinguish the Kleine Brogel conspiracy charged in Belgium from the conspiracy charged here.
>
> The final judgment of the Court of Original Jurisdiction of Brussels, issued on September 30, 2003, provides a detailed description of the charges against Mr. Trabelsi in Belgium and further demonstrates that the

> charges are the same as the charges in this matter. *See*
> [(Appx: 403-09),] Exhibit D (Court of Original
> Jurisdiction of Brussels (Sept. 30, 2003)) at 45-51. The
> Belgian judgment describes "the charges related to
> criminal conspiracy" as "the existence in Belgium of a
> pool of very militant Muslim fundamentalists who
> recruited volunteers in order to send them to receive
> military training in Afghanistan under the Taliban, so that
> they could later be sent to various war fronts (Afghanistan,
> Chechnya . . .), or to 'smuggle' them into Europe to form
> either dormant or active anti-Western terrorist network
> cells[.]" *Id.* at 49. The judgment also specified that the
> charges included two types of conspiracies, one to commit
> forgeries to help send recruits for training and another
> intended to promote a "suicide attack" (or "terrorist
> attack") intended to harm people or property. *Id.*

(Appx: 320-21). After defense counsel filed the reply containing this statement, the

government filed six different pleadings related to the motion to dismiss, exhibits

supporting the motion, and a motion to compel additional documents in support of

the motion. *See* Dkt. #s 94, 96, 105, 107, 112, & 114. Although at least one of

these documents addressed the government's allegations regarding differences

between the Belgian and United States offenses, not once did the government

dispute that Mr. Trabelsi was charged with conspiracy in Belgium.

At the September 30, 2015 hearing on the motion to dismiss, defense counsel

repeatedly referred to the Belgian "conspiracy" charges. Tr. 9/30/2015 at 26 ("But

he was charged with a broad conspiracy in Belgium as well, and it was the

conspiracy, the Al-Qaeda conspiracy to blow up Kleine Brogel . . ."), 34 ("So, for

43

example, where the – in Belgium, he's accused of conspiring and attempting to destroy, through an explosion, the Kleine Brogel military base.  I think that that readily compares to conspiring – and to kill the United States nationals abroad, when the United States nationals abroad that they're charging him with conspiring to kill are at the Kleine Brogel Air Force Base, it's the same."), 36 ("While they're not word for word the same, it's essentially the same elements that needed to be proved: That he was conspiring with Al-Qaeda to blow a bomb up in Kleine Brogel.") .  In response, again, government counsel did not dispute that the Belgian government charged Mr. Trabelsi with conspiracy, instead arguing procedural issues relating to its position that the district court could not "second-guess" the Belgian authorities, *id.* at 44-51, and attempting to distinguish the offenses based on the jurisdictional elements of the United States charges discussed next.  *Id.* at 55.

### B.  United States Nationals, Interests and Designations

Count Two charges conspiracy and attempt to use a weapon of mass destruction against United States nationals outside the United States and against property used by the United States, which the district court distinguished from Belgian charge A based on the required proof that the offense was against United States nationals or United States interests.  (Appx: 759).  Similarly, the court found that Counts Three (conspiracy to provide material support) and Four

44

(providing material support) were distinguishable from the Belgian charges because they require proof that support was given to an organization designated as a terrorist organization by the United States, whereas the Belgian offenses did not require proof that the organization was so designated by the United States.    (Appx: 762-64).

Both the Belgian and the United States offenses charge Mr. Trabelsi with participating in the al Qaeda plot to bomb Kleine Brogel.    The charged offenses cannot be distinguished because Belgium did not require a finding that the persons present at Kleine Brogel were United States citizens or because Belgium did not require a finding that the United States had designated al Qaeda as a terrorist organization, but rather required a finding that al Qaeda was an "association formed for the purpose of causing injury to a person or property" or an "organization of individuals whose purpose is to use force."    These are precisely the non-essential elements and descriptions of the same offenses with different terminology that the Treaty provides should not be used when comparing offenses.    *See* Extradition Treaty, Art. 2, ¶ 4(a) (state "shall consider only the essential elements"); ¶ 4(b) (state shall not consider elements of United States offenses designed "for the purpose of establishing jurisdiction in a United States federal court"); ¶ 4(c) (states "shall

45

disregard that the respective laws do not place the offense within the same category of offenses or describe the offense by the same terminology").

The focus should not be on the terms the respective countries use to describe the offenses, but the nature of the conduct that is proscribed. The statutes that are the basis for Belgian charge A prohibit conspiring and attempting to destroy property through an explosion and increase the penalty for such offenses when the perpetrator knew a person would be present; the statue that is the basis for Count One prohibits conspiracies and attempts to kill people, and the statute that is the basis for Count Two prohibits conspiracies and attempts to use a weapon of mass destruction (including an explosive device) against persons or property. The statutes charged in Belgian charges D and Q prohibit support of and participation in criminal organizations that are intent on attacking people or property (charge D) or using force (charge Q). The statutes charged in United States Counts Three and Four prohibit support of and participation in designated terrorist organizations, which are organizations intent on attacking people or property and using force. The conduct proscribed by the charged statutes is the same. The United States and Belgian statutes are both designed to prohibit participation in and support of criminal organizations and plots by those organizations to harm people or property through bombing. And here, the particular conduct charged is the same: In

46

Belgium, Mr. Trabelsi was charged with conspiring and attempting to bomb Kleine Brogel, while people were present, just as he is charged in the United States.   In Belgium, Mr. Trabelsi was charged with supporting the same criminal organization that the United States charges him with supporting, al Qaeda.   The terminology used in the United States and Belgium statutes to describe the offenses is, not surprisingly, not identical, but the essential elements and prohibited conduct are the same.

Even if the required proof regarding a United States national, property or interest for the United States offenses were a sufficient distinguishing factor, the offenses are not distinguishable under *Blockburger* because the Belgian offenses do not require proof of an element not required by the United States offenses.   The district court distinguished Count Two from Belgian charge A by finding that the portion of Count Two charging an attack against United States property did not require proof that Mr. Trabelsi knew a person would be present, as required by the Belgian charge A.   (Appx: 759).   This finding – a position not argued by the government below – ignores the structure of both the Belgian and the United States statutes.   Both statutes contain separate provisions prohibiting attacks by explosion against property and against persons, and Mr. Trabelsi was charged under both the property and persons provisions of both the United States and the Belgian statutes.

47

Section 2332a, charged in Count Two, prohibits conspiracy and attempt to attack United States nationals and United States property outside of the United States. Count Two charges both provisions.    Charge A in Belgium was filed under Articles 520 and 510 of the Belgian Code; Article 520 prohibits attacks against property and Article 510 increases the penalty when the attack involved persons (the perpetrator had to have known persons were present).    Charge A charged both provisions.

According to the district court, Belgian offenses D and Q contain an element not required for the § 2339B charges here because the Belgian charges did not require proof of an affiliation with terrorism.    (Appx: 763).    The court stated "[t]he universe of United States-designated foreign terrorist organizations may well be almost entirely subsumed by the universe of organizations formed for the purpose of using force," but then deferred to the Belgian Minister of Justice's decision to extradite, without referring to any specific finding by the Belgian Minister (or the Belgian courts) on this issue.    *Id.*    The Belgian Minister of Justice and courts did not compare the organizations punishable under charges D and Q with those that may be designated as terrorist organizations, and did not distinguish the offenses on this basis.    Moreover, as discussed above, deference is not owed to a decision of foreign authorities regarding the law of the United States.    Deferring to Belgian authorities on this issue would be particularly inappropriate given the intricacies of

48

United States law regarding the designation of terrorist organizations. Apart from there being no such finding by the Belgian Minister, no deference being owed, and deference being inappropriate, the offenses are not distinguishable on this basis.

An organization may be designated as a "terrorist organization" if it "engages in terrorist activity . . . or terrorism" or "retains the capability and intent to engage in terrorist activity or terrorism." *See* 8 U.S.C. § 1189(a)(1)(A). Terrorist activity includes unlawful activity involving the use of an explosive to endanger persons or property. *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b). Terrorism is defined as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." *See* 22 U.S.C. § 2656f(d)(2). Any organization designated as a terrorist organization, therefore, necessarily is an organization that is intent on attacking people or property (Belgian charge D) and using force (Belgian charge Q). While every organization that can be the basis for a charge under the statutes charged in Belgian offenses D and Q may not qualify as a terrorist organization under § 2339B, every organization that is designated a terrorist organization can be the basis for a charge under the Belgian statutes. As the Supreme Court has held in the context of the Constitution's Double Jeopardy Clause, a greater offense is "by definition the 'same' for purposes of double

jeopardy as any lesser offense included in it." *Brown v. Ohio*, 432 U.S. 161, 168 (1977).

For support, the district court cited *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008), noting that the Fourth Circuit differentiated, "for double jeopardy purposes, between a criminal charge under 18 U.S.C. § 2339B for providing material support to a foreign terrorist organization and a separate charge under § 2339A for providing material support that the defendant knew would be used to harm American citizens or property." (Appx: 763). *Chandia* does not support the court's finding, however, because both Counts Three and Four in the United States and charges D and Q in Belgium charge Mr. Trabelsi with supporting the organization, and neither Belgian charges D and Q, nor Counts Three and Four of the indictment require proof of intent to support particular offenses.

## C. Breadth of the Charged Conspiracies

Before erroneously finding that Mr. Trabelsi was not charged in Belgium with a conspiracy, the district court stated "[e]ven setting aside the different breadth of objectives of the offenses," (Appx: 757), but the court made no other reference to or findings regarding the breath of the conspiracy charged in the United States. Contrary to the government's position below, the facts do not support a finding that the conspiracies charged in the United States are broader than those charged in

50

Belgium.   Although the indictment charges that the "objects of the conspiracy were to destroy by terrorist means – including destructive violence and murder – people, property and interests of the United States of America, *wherever located,*" (emphasis added), this broad language does not change the offense into a broader conspiracy than that charged in Belgium.   The indictment apparently was written in this manner specifically to attempt to avoid the unavoidable double jeopardy problem.   Before the indictment was returned, United States prosecutors and agents met with Belgian police and prosecutors to discuss the case against Mr. Trabelsi. (Appx: 671).   The Belgian authorities told the United States officials that extradition would not be possible unless Mr. Trabelsi was charged in the United States with an intent to carry out an attack against a target other than Kleine Brogel. (Appx: 689 ("Magistrate Yernaux stressed, that in order to extradite TRABELSI to the U.S., the charge or charges he would possibly be sentenced for must not include his intent to carry out an attack against Kleine Brogel.")).   Adding the language "wherever located," however, does not transform the case against Mr. Trabelsi. There is no allegation against him other than the allegation that he participated in the al Qaeda plot to bomb Kleine Brogel.

In order to protect his double jeopardy rights, Mr. Trabelsi filed Defendant's Motion for Bill of Particulars and Memorandum of Points and Authorities in

51

Support Thereof.   (Appx: 40); see *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (one of the functions of a bill of particulars is to protect the defendant from retrial on the same offenses).   In opposition, the government stated that the particulars sought were provided in discovery and summarized those particulars. (Appx: 47-65).   Nothing in that opposition, counsel's review of the discovery produced by the government, or the government's arguments to date, lends any support to the argument that the offenses charged here are different from the offenses charged in Belgium.   If there were some other basis for the charged offenses (other than the Kleine Brogel plot), Mr. Trabelsi would be entitled to that information because the prosecution must state the charges with enough precision to protect the right not to be tried twice for the same offense.   *Mejia*, 448 F.3d at 445. Thus, unlike when a defendant files a motion to dismiss for failure to state a claim and the government stands firm on its right to present its case to a jury without presenting that case first to the court, *see, e.g., United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005) ("government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal"), the government is obligated to do more than make a vague claim that it will prove some broader conspiracy at trial -- it must identify the charged offense with precision.   *See Mejia*, 448 F.3d at 445.

Within the extradition documents sent to Belgium, the government made vague references to a plot to bomb the United States embassy in Paris France, a plot to which a prisoner in Paris, Djamel Beghal, allegedly confessed. (Appx: 491). The Belgian authorities believed that Mr. Trabelsi would be prosecuted in the United States for this Paris plot or the shoe bomb plot which Richard Reid attempted in December 2001. (Appx: 554 ("The purpose of the offense considered by the American authorities is broader than the reference alone to the attempt to destroy by explosive the Kleine-Brogel base, and is based on elements that have nothing to do with the Belgian file (but in particular the declarations of Djamel BEGHAL, Richard RIED, etc.")). With the extradition request, the government submitted to the Belgian government an affidavit from an Assistant United States Attorney, claiming that an alleged coconspirator, Djamel Beghal, had named Mr. Trabelsi as the suicide bomber in a plot to attack the United States Embassy in Paris, France. (Appx: 491-92). That affidavit was signed on March 12, 2008, but makes no mention of the fact that on December 14, 2005, a French court found that there was no "effective proof" of any such plot against the United States Embassy or American interests in Paris. (Appx: 535). The French court, in deciding the appeal of Mr. Beghal, found that the only "evidence" of such a plan was obtained when officials in the United Arab Emirates tortured Mr. Beghal, and the French court

53

rejected the use of this evidence as unreliable.  *Id.*  Thus, there is no evidence of

such a plot – certainly none that will be introduced at trial – and Mr. Trabelsi is not

being prosecuted for any plan to attack the Embassy in Paris.

       Nor is Mr. Trabelsi being prosecuted in the United States for the shoe bomb

plot.  The only evidence regarding Richard Reid that will be produced at trial will

be that a telephone card given to Reid by a witness, Saajit Badat, was used by Badat

to attempt to contact Mr. Trabelsi in September 2001.  According to Badat, he was

sent to Belgium to check on Mr. Trabelsi and the planned attack in Belgium, but was

unable to reach Mr. Trabelsi.  *See United States v. Sulaiman Abu Ghayth*, No.

98-cr-1023 (S.D.N.Y.), Dkt. 1577 (transcript of March 11, 2014 testimony of Saajit

Badat).  Badat later gave the telephone card to Reid, who was arrested in December

2001, after trying to ignite a shoe bomb on a flight from Paris to Miami.  According

to Badat, the shoe bomb attack was planned after September 11, 2001 and

Mr. Trabelsi, who was arrested September 13, 2001, was not involved in the shoe

bomb plan.  *Id.*; (Appx: 723).  This evidence regarding the telephone card is not, as

the Belgian prosecutor argued, (Appx: 545), evidence of a different conspiracy, but

is simply evidence of the same al Qaeda conspiracy to attack Kleine Brogel.  The

government in this case intends to present this evidence at trial as evidence that

Mr. Trabelsi plotted to attack Kleine Brogel, not as evidence that he was involved in the shoe-bomb attacks planned after Mr. Trabelsi's arrest.

The government did not argue below that Mr. Trabelsi is charged with – or that there will be evidence of – the Paris plot, the shoe bomb plot, or any other plot other than the plan to attack Kleine Brogel, nor could it. The government's case against Mr. Trabelsi is based primarily on his own statements to Belgian authorities, and Mr. Trabelsi told Belgian authorities that he agreed to participate in an attack against an American military base in Belgium (Kleine Brogel), and if that operation could not be carried out, no alternative objective had been planned. (Appx: 715). The broad language of the indictment does not transform the offense beyond that charged in Belgium.

Generally, the government is able to obtain a conviction by charging a broad conspiracy, but proving only a more narrow conspiracy contained within the broader allegation, because any variance between the proof at trial and the charged conspiracy will not require reversal where "a defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment." *See, e.g., United States v. Mobile Materials, Inc.*, 881 F.2d 866, 874 (10th Cir. 1989)

(citing *United States v. Miller*, 471 U.S. 130, 135 (1985)).   As this Court has

explained:

> [I]t is both common and appropriate for the government to
> allege a broader scheme yet prove a narrower one.   In
> *United States v. Miller*, for example, the Supreme Court
> rejected a claim that "the Fifth Amendment's grand jury
> guarantee is violated when a defendant is tried under an
> indictment that alleges a certain fraudulent scheme but is
> convicted based on trial proof that supports only a
> significantly narrower and more limited, though included,
> fraudulent scheme."   471 U.S. 130, 131, 105 S.Ct. 1811,
> 85 L.Ed.2d 99 (1985) (footnote omitted).   By alleging a
> larger scheme, the Court held, the government does not
> lock itself into proving every part of that scheme.   Rather,
> it can rest on any part that suffices to establish the
> elements of the crime charged.   *See id.* at 131, 135–36,
> 105 S.Ct. 1811.

*United States v. Coughlin*, 610 F.3d 89, 105 (D.C. Cir. 2010).

Here, the government appears to be attempting to use these principles to avoid

the Treaty's double jeopardy provision.   By charging Count One broadly as an

agreement to join the al Qaeda conspiracy to kill U.S. nationals "wherever located"

and charging Count Two as a broad conspiracy to use a weapon of mass destruction

(without specifically identifying in the indictment the targeted location), the

government was able to convince Belgian authorities that the offenses charged in the

United States are different from those charged in Belgium (leading the Belgian

authorities to erroneously conclude that the indictment in this matter does not charge

offenses charged in Belgium) and obtain Mr. Trabelsi's extradition in violation of the Treaty.   If permitted to proceed with this prosecution, the government will present at trial only the narrow evidence of the plot to bomb Kleine-Brogel and thereby circumvent Article 5 of the Treaty.

Moreover, even if the government had evidence of additional objects of the conspiracy (beyond the attack on Kleine Brogel), there was only one al Qaeda conspiracy (regardless of how narrowly or broadly defined), and double jeopardy prohibits the prosecution of Mr. Trabelsi for the broader al Qaeda conspiracy because he was charged and convicted in Belgium for the narrower, fully contained, conspiracy of planning to attack Kleine Brogel and providing support to al Qaeda. One agreement cannot be prosecuted -- first in Belgium and now in the United States -- as several conspiracies, even if the object of the agreement was to commit several crimes.   *See Braverman v. United States*, 317 U.S. 49, 53-54 (1942) ("one agreement cannot be taken to be several agreements and hence several conspiracies"); *United States v. Travillion*, 759 F.3d 281, 294 (3rd Cir. 2014) ("The Double Jeopardy Clause 'prohibits [the government] from splitting one conspiracy into several prosecutions.'").

## V. Dismissal of the Indictment is the Appropriate Remedy.

While not reaching the issue, the district court questioned whether dismissal of the indictment is the appropriate remedy for the treaty violations raised by Mr. Trabelsi, noting that Mr. Trabelsi "points to only one case in which an indictment was dismissed on the basis of incongruence with an extradition treaty," and finding "no binding authority that explicitly supports Trabelsi's assertion that he is, in fact, entitled to such relief." (Appx: 744 n.3). The Treaty double jeopardy provision, however, prohibits dual prosecutions. The Supreme Court has held that extradition treaties are "the law of the land," as acts of Congress are, and must be given full force and effect. *United States v. Rauscher*, 119 U.S. 407, 420 (1886). Although dismissals based on treaty provisions may be rare because generally the United States does not seek to violate treaties by extraditing and charging a defendant who previously was convicted of the same offenses, when the government does successfully extradite a defendant in violation of a double jeopardy treaty provision, the Court must give full force and effect to the Treaty and prohibit the dual prosecution. *See United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 577-81 (E.D.N.Y. 1995) (granting in part motion to dismiss based on treaty double jeopardy provision); *see also Johnson v. Browne*, 205 U.S. 309 (1907) (affirming discharge because treaty and statutes violated when defendant imprisoned for conviction that

58

was not subject of extradition order); *Cosgove v. Winney*, 174 U.S. 64 (1899) (defendant's arrest and detention for offense for which he was not extradited violated treaty and defendant must be discharged).

## CONCLUSION

For the foregoing reasons, the district court's order denying Mr. Trabelsi's motion to dismiss should be vacated, and Mr. Trabelsi's case should be remanded with instructions to the district court to dismiss the indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


/s/
_____

MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.   20004
(202) 208-7500

Counsel for Appellant

59

## CERTIFICATE OF LENGTH

I hereby certify that the foregoing Brief for Appellant contains no more than 13,652 words.

/s/

———————————————
MARY MANNING PETRAS

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief for Appellant, along with the accompanying Appendix for Appellant, with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on February 8, 2016.

Elizabeth Trosman, Chief – Appellate Section, Criminal Division, United States Attorney's Office for the District of Columbia, counsel for appellee, elizabeith.trosman@usdoj.gov, who is a registered CM/ECF user, will be served by the appellate CM/ECF system.

/s/

———————————————
MARY MANNING PETRAS